**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|   |   |
|---|---|
| PHISHME, INC., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 16-403-LPS-CJB |
| | ) (Consolidated) |
| WOMBAT SECURITY TECHNOLOGIES, ) | |
| INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM ORDER

Pending before the Court in this patent infringement action is Plaintiff PhishMe, Inc.'s

("Plaintiff" or "PhishMe") letter motion seeking to modify the Protective Order entered in this

case ("Motion"). (D.I. 93, 96) The Motion is opposed by Defendant Wombat Security

Technologies, Inc. ("Defendant" or "Wombat"). For the reasons discussed below, the Court

DENIES Plaintiff's Motion.

## I.     BACKGROUND

On June 1, 2016, Plaintiff commenced Civil Action Number 16-403-LPS-CJB[1] against

Defendant; the operative complaint in that case now alleges that Defendant infringes United

States Patent No. 9,398,038. (D.I. 1; D.I. 16) Defendant has, *inter alia*, asserted Lanham Act

and state law counterclaims in that case related to another PhishMe patent, U.S. Patent No.

9,356,948 (the "'948 patent"). (D.I. 18)[2] In its counterclaims, Defendant has alleged (and for our

---

[1]     Citations herein are to the docket in this Civil Action Number, unless otherwise
noted.

[2]     PhishMe had originally asserted the '948 patent against Defendant, and later
removed its claims as to that patent without prejudice. (D.I. 16; D.I. 108) The Court recently
issued a Report and Recommendation recommending that the District Court grant-in-part and

purposes, there really is no dispute) that it and Plaintiff are direct competitors in the market for, *inter alia*, cyber security awareness and training software for organizations. (*Id.* at 8 at ¶ 1; *id.* at 10-11 at ¶¶ 11-19; *id.* at 12 at ¶ 29; *id.* at 29 at ¶ 155; *see also* D.I. 99 at 1; D.I. 103, ex. 2 ("Tr.") at 25 (Wombat's counsel noting that the parties are "vigorous competitors")) On June 28, 2017, Chief Judge Leonard P. Stark referred the case to the Court to hear and resolve all pre-trial matters, up to and including the resolution of case-dispositive motions. (D.I. 85)

A jointly-proposed Protective Order was entered by the Court in Civil Action Number 16-403-LPS-CJB on November 1, 2016. (D.I. 24) That Protective Order, at issue here, requires that, *inter alia*, there be three levels of protection for confidential information: (1) "CONFIDENTIAL Material," which up to three of each party's employees, officers or directors can access; (2) "ATTORNEY'S EYES ONLY ['AEO'] Material," with access restricted to a smaller group of persons, including outside counsel (but not including any party employees, officers or directors); and (3) "Prosecution Bar Material," with access restricted to outside counsel and further conditioned on forbearance from certain patent prosecution activities. (D.I. 24 at 2-4, 9-13; D.I. 96 at 1)[3] To date, Wombat has produced a significant amount of AEO

---

deny-in-part PhishMe's motion seeking dismissal of the Lanham Act and state law counterclaims, (D.I. 111), to which objections have been filed, (D.I. 114; D.I. 115).

[3]     Pursuant to the Protective Order, AEO Material is material that the designating party "believes in good faith is not generally known to others and has significant competitive value such that unrestricted disclosure to others would create a substantial risk of serious injury, and which the [d]esignating [p]arty (i) would not normally reveal to third parties except in confidence or has undertaken with others to maintain in confidence; (ii) believes in good faith is protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy; or (iii) believes in good faith constitutes proprietary financial, technical or commercially sensitive competitive information that the [p]roducing [p]arty maintains as highly confidential in its business." (D.I. 24 at 2-3) Prosecution Bar Material is "[s]ource code designated by the [p]roducing [p]arty . . . and any [CONFIDENTIAL

Material to PhishMe, including documents reflecting Wombat's business and products, financial position, strategic planning, competitive intelligence, and customer contract negotiations. (D.I. 99 at 2-3; D.I. 105 at 2 & ex. 1; Tr. at 25)  Indeed, it appears that a significant amount of the documents that each side has produced to the other in this case have been designated as AEO Material. (D.I. 96, ex. 4 at ¶ 6; Tr. at 15, 25)[4]

On June 16, 2017, Plaintiff commenced a second case against Defendant, alleging infringement of U.S. Patent Nos. 9,591,017 and 9,674,221.  That action—Civil Action No. 17-769-LPS-CJB—was also referred to the Court to hear and resolve all pre-trial matters, up to and including the resolution of case-dispositive motions. (Civil Action No. 17-769-LPS-CJB, D.I. 9)  Thereafter, Civil Action No. 17-769-LPS-CJB was consolidated with Civil Action No. 16-403-LPS-CJB by joint stipulation and by order of the Court. (D.I. 86)  The Protective Order at issue here thus applies to both of the consolidated cases.

On July 19, 2017, the parties notified the Court of the instant Motion. (D.I. 93)  With the Motion, Plaintiff asks the Court to modify the Protective Order to permit one in-house counsel of Plaintiff to access AEO Material:  Plaintiff's General Counsel, Secretary and Chief Privacy Officer Shane McGee, who joined Plaintiff (and took on each of those roles) on October 31, 2016. (D.I. 96 at 1; *see also id.*, ex. 2 at 10; *id.*, ex. 4 at ¶ 3; D.I. 103, ex. 1 at ¶ 1)  The parties thereafter filed letter briefs in support of their positions. (D.I. 96; D.I. 99)  The Court held a teleconference to address the Motion on August 10, 2017.  Following the teleconference, the

---

Material or AEO Material] that bears a label 'Subject to Prosecution Bar[.]'" (*Id.* at 4)

[4]        Wombat's counsel estimated that of the approximately 200,000 pages of documents it has produced, the "majority" of them are designated as AEO Material. (Tr. at 35)

3

Court ordered that the parties may file one additional submission apiece that addressed certain issues raised during the teleconference. Each side then submitted supplemental materials, and the briefing was closed on August 18, 2017. (D.I. 103; D.I. 105)

## II. DISCUSSION

### A. Legal Standards

Federal Rule of Civil Procedure 26(b)(1) permits, with certain limits, "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1). A producing party may ask the Court to minimize its burden to turn over discoverable information by ordering that a protective order be issued, to protect it from "annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c)(1). One such order can allow that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way[,]" *id.*, to, *inter alia*, an attorney for one of the parties, *see Blackbird Tech LLC v. Serv. Lighting & Elec. Supplies, Inc.*, Civil Action No. 15-53-RGA, 2016 WL 2904592, at *1 (D. Del. May 18, 2016). A party seeking a modification to a protective order (here, Plaintiff) regarding an attorney's access to otherwise protected information carries the burden of demonstrating "good cause" for the modification. *Cf. In re Deutsche Bank Trust Co. Ams.,* 605 F.3d. 1373, 1378 (Fed. Cir. 2010); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 790 (3d Cir. 1994); *Apeldyn Corp. v. AU Optronics Corp.*, Civil Action No. 08-568-SLR, 2012 WL 2368796, at *2 (D. Del. June 13, 2012); *Phillips Petroleum Co. v. Rexene Prods. Co.*, 158 F.R.D. 43, 46 (D. Del. 1994); *Cytosport, Inc. v. Vital Pharm., Inc.*, No. CIV. S-08-2632 FCD/GGH, 2010 WL 728454, at *1 & n.3 (E.D. Cal. Mar. 2, 2010); *see also* (Tr. at 18).

4

The United States Court of Appeals for the Federal Circuit[5] has stated that in determining whether good cause has been shown to support modification to a protective order of the type at issue here, a court must first consider whether the modification would bring with it an "unacceptable risk of inadvertent disclosure" or competitive misuse of confidential information. *In re Deutsche Bank,* 605 F.3d. at 1378-79 (citation omitted).[6] The Court must then "balance" that risk against the potential harm to the moving party, were the modification not to be adopted, and were it to thus face restrictions on its right to have the benefit of counsel of its choice. *Id.* at 1380.

## B. Discussion

### 1. Unacceptable Risk of Inadvertent Disclosure or Competitive Misuse

In assessing whether a proposed modification of a Protective Order would present an

---

[5] The parties do not directly address the issue of whether regional circuit law or Federal Circuit law governs the determination of whether, and under what circumstances, a modification to a protective order, of the type at issue here, is appropriate. Even assuming that regional circuit law applies, *see Baystate Techs., Inc. v. Bowers,* 283 F. App'x 808, 810 (Fed. Cir. 2008) (applying First Circuit law in resolving a protective order dispute), the Court will still—as have our Court and other courts in cases involving patent disputes—look to the Federal Circuit's case law for helpful guidance as to these issues. *See, e.g., Blackbird Tech LLC,* 2016 WL 2904592, at *1; *R.R. Donnelley & Sons Co. v. Quark, Inc.,* No. CIVA 06-032 JJF, 2007 WL 61885, at *1 (D. Del. Jan. 4, 2007); *Boehringer Ingelheim Pharm., Inc. v. Hercon Labs. Corp.,* Civ. A. No. 89-484-CMW, 1990 WL 160666, at *1-2 (D. Del. Oct. 12, 1990); *see also Intel Corp. v. VIA Techs., Inc.,* 198 F.R.D. 525, 528 (N.D. Cal. 2000).

[6] As numerous courts have remarked, the inquiry here is not directed to an attorney's ethical standards, because it mainly focuses on the likelihood of inadvertent disclosure or misuse. *Blackbird Tech LLC,* 2016 WL 2904592, at *1 n.2. The Court stresses that in its discussion below, it is in no way presuming or suggesting that Mr. McGee would intentionally disclose or misuse confidential information. The primary concern, as it is in all such cases, is the extent to which the human mind is such that it becomes very difficult—once one learns of a competitor's confidential information—to completely insulate that information from the thought process involved in providing one's client advice on competition-related issues.

5

unacceptable risk of inadvertent disclosure or competitive misuse of confidential information, it would be error to deny access solely because of an in-house counsel's "general position"; instead, "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party . . . must govern any concern for inadvertent or accidental disclosure." *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1467-68 (Fed. Cir. 1984); *see also Boehringer Ingelheim Pharm., Inc. v. Hercon Labs. Corp.*, Civ. A. No. 89-484-CMW, 1990 WL 160666, at \*1 (D. Del. Oct. 12, 1990). This decision will turn, then, on a fact-intensive inquiry into whether affected counsel (here, Mr. McGee) participates in "competitive decisionmaking" at PhishMe. *U.S. Steel Corp.*, 730 F.2d at 1467-68; *In re Deutsche Bank*, 605 F.3d at 1378. The Federal Circuit has defined "competitive decisionmaking" as "counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel Corp.*, 730 F.2d at 1468 n.3; *see also In re Deutsche Bank*, 605 F.3d at 1378-79.

Here, the parties focus much of their briefing on whether Mr. McGee, in fact, participates in competitive decisionmaking. The Court will similarly reserve much of its focus for this issue. In addressing that question, it makes sense to first assess what we know about Mr. McGee's responsibilities at PhishMe (drawn from two declarations that Mr. McGee has submitted and a few other materials of record):

- Mr. McGee states that, in his role as General Counsel, he is "responsible for all of PhishMe's legal affairs and provide[s] advice and counsel to the company on legal, compliance, and privacy matters." (D.I. 96, ex. 4 at ¶ 3) He reports directly to Rohyt Belani, PhishMe's Chief Executive Officer ("CEO"). (*Id.*)

6

- Mr. McGee avers that while he "participate[s] in evaluating whether other companies are infringing PhishMe's intellectual property rights and in formulating enforcement strategies[,]" he is "not authorized, however, to make the ultimate decisions on whether and on what terms to license PhishMe's intellectual property, including the patents PhishMe has asserted against Wombat, or on whether to enforce PhishMe's patents against entities it believes infringe[,]" or as to whether initiate or settle litigation. (*Id.* at ¶¶ 4-5) PhishMe's CEO and its Board of Directors ("Board") make those "ultimate decisions[.]" (*Id.* at ¶ 4)

- Mr. McGee also manages PhishMe's "outside patent prosecution counsel in the prosecution of patent applications and in post-issuance proceedings related to PhishMe's patents." (*Id.* at ¶ 5)

- Additionally, Mr. McGee supervises two other in-house attorneys and a barrister-in-training. (*Id.* at ¶ 3) One of those two attorneys, *inter alia*, reviews and drafts contracts, developing contractual language based on terms negotiated by PhishMe's business teams. (D.I. 103, ex. 1 at ¶ 4).

- Mr. McGee states that he plays no part in "PhishMe's sales, marketing, or product development efforts, including [1] designing or developing PhishMe's products; [2] identifying prospective customers, investors, or other business partners; [3] identifying potential strategic transactions or business opportunities; and [4] determining product pricing." (D.I. 96, ex. 4 at ¶ 7) Any participation he has in the company's competitive decisions flows from his provision of advice to PhishMe's business personnel on the legal or privacy-related implications of the various competitive paths those business persons are considering or have tentatively chosen. (*Id.*; *see also* Tr. at 9-10)

- In a November 2016 press release touting Mr. McGee's hire, PhishMe described his role to include "acting as a strategic business partner"; it also noted how, in his prior role as General Counsel for another company, Mandiant Corporation ("Mandiant"), Mr. McGee "negotiated and finalized" the over $1 billion dollar sale of Mandiant to another entity. (D.I. 99, ex. 1 at 1) Despite the language to this effect in the PhishMe press release, Mr. McGee now states that, in fact, he "did not negotiate the business terms in connection with the sale of Mandiant" and that, in any event, his

responsibilities at PhishMe "do not include negotiating the business terms of strategic transactions, customer contracts, or other business agreements." (D.I. 103, ex. 1 at ¶ 5)

- PhishMe has a management team of 15 executives, of which Mr. McGee is one. (*Id.* at ¶ 2) Other members of this management team are responsible for departments that serve a business or competitive function (such as business development, sales, product development, marketing, and the like). (*Id.*) Mr. McGee does not engage in "any work for these departments related to competitive decision-making or otherwise fill any gaps in such departments." (*Id.*) Mr. McGee's role, instead, is to "provide legal advice to . . . other [Wombat] departments who are responsible for the competitive operations that PhishMe undertakes." (Tr. at 8-9)

- As a member of the management team, Mr. McGee attends management team meetings that also include the company's Board. In those meetings, he states that he participates "solely to identify legal issues and provide legal and compliance advice" and does not participate in any of the "competitive decisions[.]" (D.I. 103, ex. 1 at ¶ 3) Mr. McGee further explains that he is often the only attorney who advises the Board on the status of the company's legal matters and on the development and enforcement of its intellectual property portfolio; the company has rarely used outside counsel to play this role. (D.I. 96, ex. 4 at ¶¶ 3-4)

With these statements about Mr. McGee's responsibilities firmly in mind, the Court has next attempted to distill down a number of the factors that our Court and other courts have examined when assessing the risk of inadvertent disclosure or competitive misuse (most of which have to do with determining whether an attorney participates in "competitive decisionmaking").

First, courts have looked at the extent to which the in-house counsel plays an active, first-person role in strategic and competitive decisionmaking (e.g., by making certain decisions himself that directly affect relevant competition with other entities). Obviously, to the extent that the affected counsel is the final decisionmaker in this regard, this would (almost by definition)

8

dictate that he or she is a "competitive decisionmaker."[7]

Here, Mr. McGee has repeatedly stated that he does not himself make final decisions on issues affecting competition (e.g., with regard to pricing, product development, business acquisitions or the like); others, particularly PhishMe's CEO and its Board, make those decisions instead. The Court credits these statements, *see Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577, 1579-80 (Fed. Cir. 1991), and thus, this factor supports PhishMe's Motion.

Second, courts have assessed the extent to which counsel—even if he or she does not make competitive decisions—nevertheless directly advises other high level executives at the company, who are themselves competitive decisionmakers in the subject matter areas relating to the suit in question. *See Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 530-31 (N.D. Cal. 2000) (finding that concerns about the risk of harm from competitive decisionmaking were exacerbated where a Senior Counsel for plaintiff regularly advised the general managers of the plaintiff's business unit that were most affected by potential licensing agreements, and advised a Vice-President involved in competitive decisionmaking who had been denied access to confidential information by other courts in similar cases, and finding that it would be difficult for the Senior

---

[7]     *See Blackbird Tech LLC*, 2016 WL 2904592, at *4 (finding that the fact that two in-house attorneys served as "essentially the officers and principals of [plaintiff,]" and had the "final say" in matters of company management and case resolution, all augured in favor of a finding that they were competitive decisionmakers); *R.R. Donnelley*, 2007 WL 61885, at *2 (denying a party's President of Corporate Strategic Initiatives access to AEO Material where he served in a supervisory role in research and development and other strategic initiatives of the company); *Sullivan Mktg., Inc. v. Valassis Commc'ns, Inc.*, No. 93 CIV. 6350 (PKL), 1994 WL 177795, at *3 (S.D.N.Y. May 5, 1994) (finding that the defendant's General Counsel was involved in competitive decisionmaking to such a degree that he should be denied access to competitively sensitive data, where, *inter alia*, he not only provided legal advice, but also managed specific departments, and where his compensation was linked to business profitability).

Counsel to give advice to these other persons without drawing on protected information). Of course, the proper inquiry here is not simply about whether the counsel has *regular contact* with a competitive decisionmaker. Instead, it is on whether the nature of this contact or advice suggests that the counsel will be a *meaningful participant* in a process that leads to the making of decisions affecting competition. *Matsushita Elec. Indus. Co.*, 929 F.2d at 1580 (noting that the focus should be on counsel's "'advice and participation' in 'competitive decisionmaking'").

It is worth noting that, even when an attorney states that their role is simply to provide "legal advice" on "legal issues" to competitive decisionmakers, or when counsel asserts that they are simply an "advisor" with regard to these questions, this is not dispositive. Instead, the (1) greater the extent that an in-house attorney viewing confidential material like that at issue here is one of few people advising the ultimate decisionmaker, and (2) the greater the role counsel plays in that advice-giving process, then (3) the greater the chance that, inadvertently, access to the confidential material may cloud the types of advice counsel provides, and may ultimately play an important role in the decisionmaking process.[8]

---

[8]      *Compare Cytosport, Inc.*, 2010 WL 728454, at *3 ("If the CEO is not a lawyer, query who will advise him on such issues. Questions such as the extent that in-house counsel will be advising the employer on such legal issues as input on contract formation, marketing, and employment are important [in this inquiry.]"); *and Sullivan Mktg.*, 1994 WL 177795, at *3 (finding that although defendant's General Counsel stated that his input was limited to "legal issues[,]" his attendance at company strategy meetings where pricing tactics were discussed and where knowledge of a competitor's marketing plans would be particularly crucial indicated that the risk of inadvertent disclosure was high, as it "is often difficult to draw the line between legal and business advice" in such contexts), *with Koninklijke Philips N.V. v. Amerlux, LLC*, 167 F. Supp. 3d 270, 272-73 (D. Mass. 2016) (finding that plaintiffs' in-house counsel did not participate in competitive decisionmaking in a manner that was problematic, in part because the patents-in-suit involved LED lighting technology, and counsel did not interact with plaintiff's lighting unit in any way implicating competitive decisionmaking), *and R.R. Donnelley*, 2007 WL 61885, at *1 (permitting a party's Chief Patent Counsel access to AEO Material, in significant part because he did *not* report directly to any business person with direct responsibility for

10

Here, it is clear that while Mr. McGee may not be the "final decisionmaker" as to issues regarding pricing, product design or those otherwise made in light of similar information about a competitor (like Wombat), he plays a very important role in the process that leads to those decisions. He provides legal advice to the final decisionmakers (including the company's CEO and its Board) on these issues. (Tr. at 8-9) Moreover, Mr. McGee is not only the sole in-house attorney who provides that kind of advice, but in most instances, he is really the *only* attorney who ever does so (since outside counsel has not traditionally played any role in that process). This all militates in favor of denial of the Motion.[9]

A third factor, one particular to the patent context, is whether the in-house counsel plays a significant role in the enforcement of a company's intellectual property (including the extent to which that counsel makes determinations about whether to pursue patent litigation against competitors or to license those competitors). *Blackbird Tech LLC*, 2016 WL 2904592, at *1 (citing cases). Here, as noted above, Mr. McGee states that he does not make the "ultimate decisions" on "whether and on what terms to license PhishMe's intellectual property . . . or on

competitive decisionmaking).

[9]     The Court also notes the apparent disconnect between the way PhishMe described Mr. McGee's role in the November 2016 press release that was issued just after he was hired, and the way it has described Mr. McGee's role since this legal issue arose. In the press release, Mr. McGee is referred to as a "strategic business partner[,]" (D.I. 99, ex. 1 at 1), but now, PhishMe seems to shy away from that kind of description, (Tr. at 10). In the press release, PhishMe also describes Mr. McGee's prior work at Mandiant as including "negotiat[ion] and finali[zation]" of Mandiant's sale, (D.I. 99, ex. 1 at 1); but now, PhishMe states that this description is incorrect (or perhaps, at least a bit misleading), (D.I. 103, ex. 1 at ¶ 5 (Mr. McGee averring that "I did not negotiate the business terms in connection with the sale of Mandiant")). At a minimum, it seems like PhishMe wanted the reader of that press release to conclude that Mr. McGee had real experience with the kinds of issues and decisions that play an important role in setting a company's future "strategic" course.

11

whether to enforce PhishMe's patents against entities it believes infringe." (D.I. 96, ex. 4 at ¶ 5) Those "ultimate decisions" are made by PhishMe's CEO, Mr. Belani, and by the company's Board. This is because the company is at a place "in its life cycle [where] these decisions are sufficiently important that the[se types of high-level] ultimate decision-makers are required for something as important as whether to initiate a lawsuit, whether to license its intellectual property and on what terms." (Tr. at 6; *see also* D.I. 105, ex. 2 (article noting that Mr. Belani: (1) described 2018 as a "'pivotal year'" for the company, (2) explained how the company is currently "focused on . . . potential acquisitions" that would "accelerate its product or technology roadmap[,]" (3) noted that the company is releasing new products in 2018, and (4) cited Wombat as a competitor of PhishMe))

However, even Plaintiff has acknowledged that "Mr. McGee's role is still *significant* with respect to th[e]se issues [because h]e is involved in advising PhishMe's CEO and its Board on whether to enforce and who to enforce against and whether to license[,]" and that Mr. McGee's "informed counsel [is] *essential* in how PhishMe makes those decisions." (Tr. at 6-7 (emphasis added)) Mr. McGee's knowledge of Wombat's products, its marketing information and other aspects of its AEO Material would, *inter alia*, "be directly relevant to [his] evaluation of licensing agreements" in subject matter areas in which the company competes with Wombat. *Intel*, 198 F.R.D. at 530. And the fact that he reports to the final decisionmakers directly—and that his legal advice is crucial to shaping those decisions—suggests that it would be difficult for him to "lock[] up trade secrets in [his] mind" while providing the advice. *Id.* (internal quotation marks and citation omitted); (D.I. 105 at 2 (Wombat asserting that "it is unrealistic to believe that Mr. McGee could advise PhishMe on whether or when to sue Wombat on a new patent or to

12

license a patent to a competitor while 'compartmentaliz[ing] and selectively suppress[ing]' all of Wombat's AEO information."))

Unsurprisingly, courts have found that this type of significant, active role in the direction of patent litigation and licensing—particularly for a company at PhishMe's stage of life—weighs in favor of a conclusion that Mr. McGee participates in competitive decisionmaking. To be sure, PhishMe is not a patent licensing entity, and so it is not that (as with such entities) its *entire business model* is built on the concept of bringing patent litigation and/or entering into patent licensing agreements. *Blackbird Tech LLC*, 2016 WL 2904592, at *2, *4 (noting that, where an "'essential'" part of a plaintiff company's business was "acquiring patents and asserting them in litigation[,]" in-house counsel were competitive decisionmakers where they, *inter alia*, "essentially have the final say on what patents [plaintiff] will acquire and assert in subsequent litigations"). But undisputedly, PhishMe is at a point in its corporate history where deciding whom to sue for patent infringement (or license) still amounts to a particularly "important" part of its business strategy. And at PhishMe, working with a "small group of inhouse attorneys[,]" Mr. McGee is the "only one of those . . . attorneys with a significant role in managing litigation and enforcing PhishMe's patents." (Tr. at 8) Taking all of this into account, there is a real risk that to give Mr. McGee "access to [Wombat's] confidential technical and financial information would raise the specter of prosecuting or acquiring patents that read on [Wombat's] products." *Blackbird Tech LLC*, 2016 WL 2904592, at *5 (citing *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.*, LLC, Civil Action No. 6:07-CV-346, 2008 WL 5634214, at *5 (E.D. Tex. Mar. 14,

13

2008)).[10] This too supports denial of the Motion.

Fourth, courts have looked at the degree to which the in-house counsel at issue plays a role in patent prosecution. That process—in which an attorney might inadvertently utilize a competitor's confidential information in determining how to craft new patent claims that could read on the competitor's products—carries with it a particularly significant risk of competitive misuse. *In re Deutsche Bank*, 605 F.3d at 1380; *Commissariat A L'Energie Atomique v. Dell Comp. Corp.*, No. Civ.A 03-484-KAJ, 2004 WL 1196965, at \*2 (D. Del. May 25, 2004); *cf. Koninklijke Philips N.V. v. Amerlux, LLC*, 167 F. Supp. 3d 270, 272-73 (D. Mass. 2016) (finding that plaintiffs' in-house counsel did not participate in competitive decisionmaking, in part because they did not prosecute or oversee prosecution of the company's patents). Here, Mr. McGee (and nobody else) directly oversees and "manage[s]" PhishMe's patent prosecution efforts. (D.I. 96, ex. 4 at ¶ 5; *see also* Tr. at 20) PhishMe is very aware (having cited to it) of some authority suggesting that if in-house counsel provides only "'high-altitude oversight'" of

---

[10]     *See also Pinterest, Inc. v. Pintrips, Inc.*, Case No. 13-cv-04608-RS (KAW), 2014 WL 5364263, at \*2-3 (N.D. Cal. Oct. 21, 2014) (finding that a company's Deputy General Counsel was engaged in competitive decisionmaking, even though the counsel's stated role was not to advise on business strategy or on what new products to develop or how to price those products, because of counsel's "substantial role on the [company's] legal team, his control over Plaintiff's intellectual property, his influence over whether Plaintiff will pursue litigation against another business entity, and his advisory work with product teams"); *Affymetrix, Inc. v. Illumina, Inc.*, No. Civ.A 04-901-JJF, 2005 WL 1801683, at \*2 (D. Del. July 28, 2005) (finding that one in-house counsel could not be included as a party to the protective order, in that her role was linked to competitive decisionmaking, since she "is part of [defendant's] management team and is involved with settling patent litigation and licensing"); *Intel*, 198 F.R.D. at 530 (finding that plaintiff's Senior Counsel was engaged in competitive decisionmaking, where counsel was "actively involved in negotiating the terms of licensing agreements as part of settling lawsuits" and where her "knowledge of technical aspects of [defendant's] products, [defendant's] licensing agreements, and marketing information would be directly relevant to her evaluation of licensing agreements of related products" such that this might give plaintiff a "competitive advantage" in negotiating related licenses in the future).

14

patent prosecution, and "is not directly involved in the drafting or prosecution of patent applications[,]" then this might mitigate any risk of competitive misuse in the patent prosecution arena. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 274 F.R.D. 576, 582 (E.D. Va. 2010) (cited in D.I. 96 at 3 n.19 and D.I. 103 at 1 n.4). But, despite having filed two declarations, Mr. McGee has provided no indication that his "manage[ment]" of patent prosecution is only the kind of high-level, not-so-deep-into-the-details role that is referenced by this caselaw.

The Court does note that the Protective Order allows for certain, highly-sensitive material to be marked "Prosecution Bar Material" (material that Mr. McGee would not be permitted to access, no matter the outcome of the instant Motion). (D.I. 96 at 4) But that does not entirely eliminate the risk at issue in the patent prosecution space. It is clear that even the AEO Material that is not further designated as Prosecution Bar Material still involves the kind of very sensitive information that could well be inadvertently misused to Wombat's detriment in PhishMe's future patent prosecution efforts. (D.I. 99 at 4)[11] And *a lot* of AEO Material has been produced in this case—the parties agree that the lion's share of their productions so far have consisted of that kind of material. In the end, Mr. McGee's apparently substantive role in overseeing patent prosecution efforts provides another reason to consider him a participant in competitive decisionmaking.

Fifth, courts have inquired about the size of the company (and its in-house legal department) in which the affected counsel works. To the extent that the company is relatively

___

[11]    According to Wombat, "PhishMe has additional pending patent applications that are related to the asserted patents in this case and that could be amended based on Wombat's AEO information, exacerbating the risk of inadvertent disclosure by Mr. McGee." (D.I. 99 at 4)

15

small (and that, as a result, this increases the likelihood that the in-house counsel would undoubtedly need to work closely with other competitive decisionmakers), that could "exacerbate the potential for inadvertent misuse or disclosure[.]" *Blackbird Tech LLC*, 2016 WL 2904592, at *4; *see also Cytosport, Inc.*, 2010 WL 728454, at *4. As for the size of the in-house legal department, where the department is of sufficiently large size that, if a "future project [of the counsel-at-issue] were to present a conflict because of information that has been learned from discovery in this lawsuit, the conflicting assignment could be rerouted to another individual not possessing the conflicting information[,]" that might help lessen concerns about future misuse. *Boehringer Ingelheim*, 1990 WL 160666, at *2; *see also* (Tr. at 30). But if the legal department is very small, that would tend to enhance such concerns, since the affected counsel might, by necessity, have to play a role in such future projects. *Cytosport, Inc.*, 2010 WL 728454, at *4 ("The risk and potential danger of disclosure is compounded here in that [the defendant] has only two attorneys on its in-house counsel team, and it is a relatively small company. . . . This is not a situation . . . similar to Microsoft which has 50 in-house attorneys, any one of which could take over in such a case and be walled off from the other attorneys and management.").

Here, it appears that while PhishMe is "not a tiny company[,]" (Tr. at 8), it is relatively small (with approximately 200 employees), (*id.*). And it is clear that its legal department is very small. (*Id.*) Mr. McGee is but one of three licensed attorneys in the department, and appears to be the only one who provides key legal advice directly to most or all of the corporate decisionmakers. This too augers in favor of denial of the Motion.

Sixth, courts have inquired about the gravity of the consequences of inadvertent disclosure or misuse. In that regard, courts have acknowledged that the risk of harm is

16

heightened where the non-moving company is a direct competitor of the movant in particular business areas (e.g., the parties sell competing products or services). *Cf. Blackbird Tech LLC*, 2016 WL 2904592, at *4-5; *see also Pinterest, Inc. v. Pintrips, Inc.*, Case No. 13-cv-04608-RS (KAW), 2014 WL 5364263, at *2-3 (N.D. Cal. Oct. 21, 2014); *St. Alphonsus Med. Ctr. v. St. Luke's Health Sys.*, No. 1:12-cv-00560-BLW-RE, 2013 WL 139324, at *4 (D. Id. Jan. 10, 2013); *Cytosport, Inc.,* 2010 WL 728454, at *5; *Intel*, 198 F.R.D. at 531. In such a scenario, were its confidential information later utilized to its detriment, the non-movant might not only be harmed in the instant litigation or in other litigation matters, but it might also see its competitive position in the market damaged in ways that are hard to quantify. Here, as noted above, it is undisputed that PhishMe and Wombat are fierce, direct competitors, and so this factor also weighs against the movant.

Seventh, courts have asked whether the affected counsel proposes to use strict safeguards in handling confidential information. *Affymetrix*, 2005 WL 1801683, at *2. Here, Mr. McGee states that he will not store any AEO Material in computer systems accessible to business personnel at PhishMe, and that he will ensure that any such electronic material is password-protected, or encrypted. (D.I. 96, ex. 4 at ¶ 8) This would help provide some comfort that the AEO Material at issue would be safeguarded from unauthorized access (though it necessarily cannot address the risk that *insights* from such material may inadvertently seep into the legal advice that Mr. McGee provides to others). (Tr. at 37) And so it works a bit in PhishMe's favor.

In the end though, most of the above-referenced factors indicate that the risk of inadvertent disclosure or competitive misuse is high here, and that Mr. McGee participates in competitive decisionmaking. Based on what is known, there are too many future scenarios in

17

which—if Mr. McGee is given unfettered access to Wombat's AEO Material—he may later find himself providing crucial legal advice to PhishMe decision makers as to whether PhishMe should take action that might harm Wombat's competitive position.

### 2. Harm to the Movant From Restriction on Having the Benefit of Counsel of its Choice

The Court next investigates the harm to PhishMe were it not able to have Mr. McGee access AEO Material.

PhishMe's best arguments as to why Mr. McGee's needs that access are that, since so much of the produced discovery in the case is designated as AEO Material, Mr. McGee has to see that material so he can: (1) evaluate the merits of the parties' contentions; (2) help form and approve PhishMe's litigation strategy in the case; and (3) advise PhishMe's CEO and Board of the strengths and weaknesses of each party's case, and assess possibilities for settlement. (D.I. 96, ex. 4 at ¶ 6); *see also Boehringer Ingelheim*, 1990 WL 160666, at *2.[12]  The fact that Mr. McGee (and none of the other PhishMe attorneys) is the in-house counsel who oversees this case, and who is responsible for facilitating major decisions regarding the lawsuit, demonstrates that there will be some prejudice to PhishMe if the Motion is denied. It is no doubt difficult for Mr. McGee to fully convey to his internal clients PhishMe's potential exposure here, or to provide them with a detailed assessment of the merits, without having exposure to AEO Material. (Tr. at 12) And it is not as if, were Mr. McGee precluded from accessing AEO Material, some other in-

---

[12]     Mr. McGee also states that he needs access to AEO Material in order to forecast and monitor PhishMe's legal fees and costs, and to prepare and maintain a budget for the litigation. (D.I. 96, ex. 4 at ¶ 6) But the immediacy of those needs, and their relationship to Mr. McGee's access to AEO Material, are not well set out in PhishMe's papers. (*See* D.I. 99 at 3; Tr. at 27) The Court will thus not take them into account in its resolution of the Motion.

18

house attorney who has already been provided access to the material could play this role (since no other in-house employee can review AEO Material, pursuant to the Protective Order). *See Boehringer Ingelheim*, 1990 WL 160666, at *2 (finding that the fact that certain in-house counsel were the people responsible for major decisions concerning the lawsuit favored allowing access). While this factor might auger even more strongly in favor of access were Mr. McGee a member of the trial team (he is not), *see Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55, 55-56 (D.D.C. 2007), or were he shown to have highly specialized knowledge about the subject matter of this case that no one else (even outside counsel) could replicate, *see Cytosport, Inc.*, 2010 WL 728454, at *4, it still is favorable to PhishMe's request.

However, our Court has also noted that the "risk of inadvertent disclosure cannot be overcome by the mere contention that access to confidential information is necessary for case management"; instead, the focus should be on whether "in-house counsel's lack of access would impede a party's ability to litigate through outside counsel[.]" *R.R. Donnelley*, 2007 WL 61885, at *1; *see also Intel*, 198 F.R.D. at 529. Here, PhishMe has competent and capable outside counsel. It is represented by Morrison & Foerster LLP and Young Conaway Stargatt & Taylor, LLP—two firms with extensive intellectual property litigation experience. (D.I. 99 at 2 & ex. 2); *see also Intel*, 198 F.R.D. at 529 ("The quality of the counsel representing Intel and the lack of any evidence indicating Intel will be prejudiced in prosecuting its case undermines Intel's contention that they have good cause to modify the Protective Order.").[13] Our Court has noted

---

[13]     Thus, this is not a situation where the in-house counsel at issue is the sole litigator in the case (as can occur in cases where a party has elected to have in-house counsel represent them, to the exclusion of engaging outside counsel). *See Blackbird Tech LLC*, 2016 WL 2904592, at *2-3; *Affymetrix*, 2005 WL 1801683, at *2 n.3.

that where parties are represented from the outset by capable outside counsel, "courts have little trouble balancing the harms in protective order disputes, often readily concluding that the outside counsel of a party's choice can adequately represent its interests even if in-house counsel is precluded from viewing confidential information." *Blackbird Tech LLC*, 2016 WL 2904592, at *5; *see also Pinterest, Inc.*, 2014 WL 5364263, at *3; *ST Sales Tech*, 2008 WL 5634214, at *5.

Additionally, the Court takes note of the fact that the current Protective Order has been in place for over 10 months, and that (in light of the parties' competitive relationship) it was the product of significant negotiation. (D.I. 99 at 1) To be sure, Mr. McGee did not begin his work with PhishMe until October 31, 2016—the very day that the Protective Order was submitted. And so it might be argued (as PhishMe does) that his hiring was a changed circumstance, one that (especially as PhishMe saw how the case progressed) warranted a later re-assessment of whom should access AEO Material. (D.I. 103, ex. 1 at ¶ 1; Tr. at 14-15)

Yet PhishMe had to know at some point during the period leading up to the submission of the Protective Order that it planned to bring Mr. McGee on as its General Counsel. Despite this, it agreed to the limitations on sharing confidential information that are in the current Order. And it (and Wombat, who has no in-house attorneys) were fully prepared then to manage the litigation without allowing any in-house attorney the ability to access AEO Material. The parties have done just that in the many months since the Protective Order was issued. (Tr. at 28-29) Even if less than ideal, then, it seems very possible, based on the history of this case, that the parties can sufficiently navigate the litigation without an in-house attorney having access to AEO Material.

(D.I. 99 at 2-3)[14] To "change the rules" well into this case, after so much AEO Material has been provided and so much effort went into negotiating the Protective Order, seems a bit unfair to Wombat.

All of this indicates to the Court that while PhishMe would suffer real harm were it not able to have Mr. McGee access AEO Material, that harm is not so outsized that it overcomes the serious risk of inadvertent disclosure or competitive misuse of Wombat's confidential information.

### 3. Conclusion

In the end, the Court determines that PhishMe has not met its burden to show good cause to modify the Protective Order at issue.

## III. CONCLUSION

For the reasons outlined above, Plaintiff's Motion is DENIED.

Dated: September 18, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[14] This decision does not affect the parties' ability, for example, to jointly agree that in the context of Court-involved alternative dispute resolution efforts, certain company employees who are otherwise prohibited from accessing AEO Material may see particular documents. Nor does it affect the parties' ability to challenge certain AEO Material designations, to the extent permitted by the Protective Order. (D.I. 96, ex. 1 at § 5)